3-11-0-3-8-0 Katie Scheppler and John Scheppler Appellees by Timothy Kaplan v. Country Mutual Insurance Company Appellant by Keith Carlson Mr. Carlson, you may approach. Thank you. Good morning. Mr. Carlson. Thank you, Mrs. Quirt. Keith Carlson for Country Mutual Insurance Company Appellant in this matter. This does not involve a lot of facts or case laws, relatively. Could you speak up, please? I'm sorry. This does not involve a lot of disputed facts or case law. It's a relatively straightforward situation, though, that I think you'll find, though, in the future or in the past, is repeated. Because, obviously, there have been a lot of real accidents, many cases involving medical payments and underinsured motorist coverage. Here, the question of the Common Fund Doctrine, I think, clearly does not apply in a situation where, effectively, there would be an additional payment by Country Mutual of $16,000 and change above its policy limits. We had a medical payments claim. Medical payments, of course, under the policy is a no-fault coverage. It doesn't matter if the insured was at fault or not at fault for the accident. It applies automatically to medical bills arising out of the accident within two years. And so there was an accident, there were bills, they were paid. And the policy language is very explicit that amounts payable for damages under underinsured motorist coverage will be reduced by all sums paid under medical payments. So then, therefore, pursuant to the contract, as medical payments are made, they have reduced the limits. It's a contractual policy, and it's already happened at that time. Here, in this situation, we had only, known to Country Mutual, we only had a medical payments claim, where at that point the medical payments were exhausted. After that, Country Mutual was presented with an underinsured motorist claim and advised of a tort lawsuit that had been filed about the same time it was advised of the tort lawsuit. It had been settled for an offer of the policy limits. And when Country Mutual was informed of that, they advised the counsel for the insured tort plaintiff that they were, if there was any lien, they were waiving any lien, and they were going to exercise the contractual sit-off in the policy that already exists for the underinsured motorist claim. And that has since been resolved. Country Mutual has tendered and paid the $100,000 that it believes is the remaining limits after the $100,000 tort fees payment and the $50,000 medical payments, leaving in dispute a dollar amount of $16,000, which really would be, I guess, would be more of a claim of the law firm than the shufflers normally, because they're the ones that are claiming, even though this is actually styled as the shufflers versus Country Mutual, because it's the law firm that is supposedly doing the work to create the fund, not the shufflers, but they've already been paid under their contract with their clients for their... Oh, this is about attorneys' fees. Right. Okay, clearly simple. Yeah, right. For a fund that... And I think we have... Obviously, they rely heavily on the Stevens versus Country Mutual case, which I argue why I think it's distinguishable, and that the better-reasoned answer is contained in the dissent, where there was no common fund that the court could identify, because, as I said in the initial part of my talk, the limits had already been reduced by the medical payments made. So there was no fund that they created. They certainly weren't doing anything for the benefit of Country Mutual. They didn't even advise us of what they were doing. There was, as you see in the record, there were letters, when there was only knowledge to Country Mutual, initially, of underinsured motorist medical payments claim, where they made offer if they wanted to enter into an agreement, but as the counsel conceded in the record, they never signed that agreement. There was never any meeting of the minds or agreement on that issue, and it's conceded by counsel in the record below. And so we got to the situation where the case was... The tort case was settled, Country Mutual waived. They never offered any money of that $100,000. They never took any money. They didn't object to them settling with the tort fees, and then subsequent to that, the petition was filed here, which brings us to here today, after Judge Lannon ruled on their petition, even though he disagreed with the result that he entered, but found that he thought it was too close to the Stevens 2-1 decision for him to deviate from that. And, again, I just think for the reasons set forth in that decision, which explain why... I have a question. If you waived your lien, or you didn't waive your lien on $100,000, would there be a one-third out of the... Would you have the same position? I think it is a contractual thing, so arguably they're reduced already. So if you didn't waive your lien, though, you're asking to get money out of whatever... out of some source from some other source. You're not asking to use it in the uninsured motorist claim. You're asking to get money back out of some other source, the tort fees or his payment. So I guess if you didn't... I still think the... And there's no uninsured motorist claim. Let's get the... is that somebody does something for your benefit, and they have the right to be reimbursed for that, right? Right, and here they didn't do it for our benefit because, first of all, by our contract, it already reduced uninsured motorist limits. Here, as Judge Lannon noted, you'd pay $16,000 more than your limits than if there was just, say, the tort fee that had limits of $250,000. There was no uninsured motorist claim. So, obviously, they didn't... and there's no agreement where they entered into an agreement to do it for our benefit. There's no evidence in the record they did it for our benefit. They did it for their benefit. And we did not benefit, as the dissent pointed out, and I think the language, because particularly the timeline of this case, where we, like in Stevens, they asserted a subrogation lien. Here they did not. They expressed the wage at basically the first point where they could have, when they learned of the UIM claim and received the UIM demand and it was revised at the tort feasor's offer. And so, that's why I think it's distinguishable from Stevens. There was no common fund. There certainly was no benefit. And if anything, it's a detriment because now we're exposed beyond the 250 UIM limit and which undermines the common fund doctrine of where there's a benefit. But here, again, the money, there was nothing to pay the country mutual. The money just reduced, pursuant to the contract, the UIM limit. So there's no money change hands. There's no money that there's no fund. That's the dissent in Stevens pointed out. And therefore, I think... Does it make a difference whether you waive or didn't waive your subrogation lien? I don't know that it should make a difference because arguably if there's a UIM claim in the future, the contractual language applies. But if you waive that language and you want to only make a subrogation claim against whoever, it might make a difference. I just... Because if you're... I don't know why you would... If you were... Because then in one hand, you're asserting a subrogation lien but then you're making an uninsured motorist claim so you're arguing you're going to take the money from there but then give it back on the other end. So I don't... I'm in a situation trying to remember, trying to analogize what situation could exist where the tortfeasor had additional money or they didn't pay it all or the UIM... It was thought that the case was worth less than the tortfeasor's limits and the UIM limits combined. For example, might be a situation where they might not waive and then there would be maybe a better argument for a common fund. But we had no... There was nothing to waive until we had an underinsured motorist claim. So we couldn't have... How can we... We've done something previously. We already exhausted our medical payments. There was no underinsured motorist demand made so we didn't have a reason to waive anything earlier because there was nothing to waive. Maybe in some cases, obviously there's no UIM claim. There's only... They said, oh, less than the tortfeasor's limits. Only when it was pertinent and right then we waived it. We couldn't waive something before in advance of it actually occurring or the situation occurring to waive it. So... Again, like I said, at that point, pursuant to the language, since the limits had been reduced by all sums payable pursuant to the contract, the contract that was the basis of any obligation of country mutual is only their contract and that had already... Now, for every dollar that's paid, it's reduced it. And... Obviously, underinsured motorists, there wouldn't be underinsured motorist coverage in the first place if there didn't have to be... There had to be a tortfeasor with some amount of coverage in the first place. And... So here, I... Again, I just repeat myself. There is no... There is no common... There is no common fund. The limits were already reduced. The result is... Effectively, as I said again, increases the limits that Judge Lannon recognized. And I think that... Even though it is distinguishable from Stevens on its face because of things like not waiving the lien, I think the dissent in Stevens is the better reason, decision, as well as Judge Lannon's comments on that decision. And I respectfully request the court to reverse the trial court and vacate the judgment. If anything. Thank you. Thank you. Mr. Cantlin. Mayor of Peace Department, my name is Timothy Cantlin, and we represent the shufflers in regards to this underinsured policy issue here. This case is about the common fund doctrine. And country mutuals attempt to try to avoid having to pay for legal services rendered to it and legal services which they benefited from. The common fund doctrine is separate and apart from country mutuals' contract with the insured. Stevens' case talks about it, Blair v. State Farm, Schoenholz v. Schneider. All the cases that talk about the common fund make it clear that it's separate and apart from the contract with the insured. As this court's well aware, the common fund doctrine allows an attorney who creates, preserves, or increased the value of a fund which others have an ownership interest in to be reimbursed from that fund for litigation... When you waive a lien, do you have ownership interest in it? In this particular case, the lien was never waived until after the fund was already created. The fund was created before it ever... Does that make a difference? What's that? Why does that make a difference? I don't think it really does make a difference whether they take it as a lien or as they take it as a set-off because the fund is still being created. They're still receiving a benefit from the fund. If the fund is never created, they never get $100,000 set-off of their $250,000 policy. If the fund is never created, they never get any of their MedPay back. Whether it's a set-off or a lien, the fund is still created and they still receive a benefit from that. That's why I don't believe whether it is a set-off or taken as a lien makes any difference in the case. But in this particular case, the fund was already created. What CountryMutual wants to be able to do is flip-flop. They want to have their cake and eat it too. They want to be able... If there is no underinsured policy, they want to sit there and say, you need to protect our lien. You need to protect our lien. You need to do this and reimburse us. But then, the second that they go to an underinsured claim, they want to jump on the other side of the fence and say, oh, we weren't asserting a lien. You didn't have to protect that for us. We're now waiving it. They can't have their cake and eat it too. They have to stay on one side of the fence. In this particular case, they sent two letters before the settlement and one letter after the settlement. We have a $50,000 MedPay lien. Protect our interest. And they asked us, we'll pay you a contingency fee of one-third for protecting our interest. That's what we did. We protected their interest. And then, after we protected their interest, they then said, oh, no, wait. We didn't want you to do that. And when you look at the common fund, three things must be shown to get the common fund. How do we protect their interest? How do we protect their interest? We... We... I mean, the Shefflers retained you to sue the tort fees. Right. And you got a settlement. And we got a settlement of $100,000. Policy limits, which you asked approval from the company. We asked approval for. And then they get an offset on it and they can collect the MedPay. If we didn't do that, there was no common fund in which they benefited from. That's how we protected their interest. We then didn't distribute the money to Ms. Sheffler not paying back their MedPay like they had asked. That's how we protected their interest. We didn't distribute out the $100,000 to Ms. Sheffler. We knew Country had a lien because they advised us a couple times. We protected their interest, sent them a letter advising them of the settlement, and that's how we protected their interest. Well, they're saying really what we just did is reduce the uninsured motorist limits to $200,000 because we paid out $50,000 in medical and in terms of contract with your client. Right, and they didn't say any of that. It might make a difference when they paid the $50,000. They then sent a letter to Ms. Sheffler to us saying, we're going to reduce. Well, that's in the contract. They don't have to know either. But it's also in the contract about the subrogation interest and that we have to protect that. She is supposed to protect that, and the Stephens Court addresses that. The Stephens Court, this case and the Stephens case, are eerily similar. They are right on point. In what the Stephens Court addressed, like in the Stephens, Country would have had to expend substantial administrative and legal resources to recover the $50,000 in med pay under the subrogation agreement. In Stephens, the court said that Country Mutual would have had to expend substantial administrative and legal resources to recover, I think it was $26,000, whatever the amount was in that case. In Stephens, they talked about under the subrogation agreement that the plaintiff in that case was obligated to hold the proceeds of the common fund. And like in Stephens, in this case, under the subrogation agreement, Ms. Scheffler was bound to hold the proceeds of it. And then the third thing that the Stephens Court talked about was that Country was able to limit its liability by being able to deduct from their underinsured motorist claim. I believe in that case it was $100,000 as well. So like in Stephens, Country was able to limit its liability by deducting the $100,000 in the common fund that was created by the Canton Law Firm. This case is not about the policy between the Schefflers and Country Mutual. And the cases that talk about the common fund doctrine make that clear, that it's not about the contract between them. It's about the services rendered to Country Mutual in which they benefit from the common fund that was created by the attorneys. And that's what the Stephens Court talks about. So like in that case, we created a fund. Country Mutual benefited from that fund. And pursuant to the common fund doctrine... Under the contract, let's say there was no lawsuit at all. You've got a penniless out-of-state or whatever, right? I'm sorry, I didn't hear you. You've got a penniless out-of-state whatever. There's no lawsuit filed. How much would Country Companies have to pay the Schefflers under their policy? They would have paid $50,000 in med pay. And then I didn't know if your example included an uninsured motorist. Of course it does. That's the law in the state. Okay, and if it included an uninsured motorist, then they would have paid the $250,000 policy limits, which they would have gotten... They paid the $50,000 for medical, and then they would pay $200,000 for the uninsured because the contract says we get to offset $50,000. In that particular case, they would have. Right. I believe you're probably correct on that. But if... In a different example... So the Common Fund Doctrine as a concept is that someone not a party to the contract, okay, or that one of the parties to the contract goes out and hires an attorney to pursue a lawsuit, and they get a settlement, and somehow there's a benefit to the insurance company. That's the doctrine of Common Fund, isn't it? Yes. That's why there's something owing by the insurance company to you as the attorney. What's the difference in the situation we have now versus my hypothetical? You came up with $100,000, out of which you are going to be compensated through the agreement with your client. Correct. Of which country companies it's not a party to. But, Your Honor, we created a fund which they benefited from. What is the net benefit that they got from the fund? Who got it? Ms. Scheffler or... The country companies. They were the ones that you're arguing you gave a benefit to. Right. Well, Your Honor, if this was a case in which the tortfeasor had $250,000 of underlying coverage, country mutual, their subrogation interest would have been reduced by one-third pursuant to the Common Fund, in which they would have, instead of receiving the full $50,000 of med pay, in this situation they would have only received $33,333. The other $16,000 would have went pursuant to the Common Fund. That is similar to the particular case that we have. Here, country wants to jump to the other side of the fence and say, well, we don't have to pay for attorney's fees now. How is it different than that situation? That's what I think it is akin to, is that situation, because that's the whole purpose of underinsured, is to put the person who purchases the underinsured in the same position. If country doesn't have to pay attorney's fees for receiving the benefit of this Common Fund, Ms. Scheffler is in turn getting $16,666 less in that particular case. That's why I think the Stevens Court has this right in that it's a very similar situation. The Common Fund doctrine applies to these med pay payments that are paid by these insurance companies. So that's how they benefited? Well, they benefited from us creating the $100,000 fund because they get a credit, and the Stevens Court addressed that. The Stevens Court said, first of all, they would have to expend substantial administrative and legal resources to cover the $50,000. Then the Stevens Court went on to say, under the separation agreement, she had to withhold the Common Fund. And then they said, country was able to limit its liability by deducting the $100,000 in Common Fund. They get to deduct that $100,000. If we didn't get the $100,000, they don't ever have to deduct it. They don't get the benefit of that. And if we don't get the underlying policy, they don't get any of their med pay back. That's how they're benefiting. They're certainly benefiting from us obtaining the policy, and the Stevens Court addresses that and talks about that. You mean obtaining the policy limits of the tort fees? Correct, yeah. In the Stevens case, they obtained the policy limits of the tort fees, and the Stevens Court addressed in three separate ways how Country Mutual benefited from those services. They talked about three different benefits, and I agree with the Stevens Court that there is a benefit to them, and the Stevens Court addresses that. Is it Mr. Carlson's point, though, that they sent letters to you saying, please protect our interests, and you didn't respond, saying, we will, that you shouldn't be compensated or reimbursed because of that? And my question is, does Stevens require you to agree? No, Stevens does not require us to agree to any type of writing. Stevens does not address that. What they address are their specific things to when the Common Fund Doctrine doesn't apply, and this is what Country Mutual did not do at all, and they don't even bring up in their brief. But for the Common Fund Doctrine not to apply, there's two things that must be done. First, there must be an express statement that it does not want the firm to take action to recover its interest, and two, it must expressly state that they will not pay for the recovery of its interest. Were either one of those things done in the correspondence that was sent back? No, Your Honor, and that's what's important. You know, I laid out the elements of what the Common Fund Doctrine are. We met all of those elements. Then for the Common Fund Doctrine not to apply, Country Mutual needed to do two things. They needed to, one, expressly tell us that they don't want us to do it, and then, two, expressly tell us that they're not going to pay us. Neither of those were done. Mr. Carlson makes no arguments about that, and it's nowhere in any of the briefs, and it just, they never did. They sent us letters, asked us to protect their interest. We protected their interest. The Stevens Court talks about how, in this particular situation, how we did provide a benefit to them, and that's why the Common Fund Doctrine should apply and Judge Lannon's ruling should be upheld. That's all I have if there's any questions. Thank you. Mr. Carlson. Can you address those specific points you concluded with? Yes, Your Honor. About the, as I point out here in this case, the doctrine he cites, too, about telling someone you don't want them to do anything for your interest, you know about there's a pending tort suit, for example, or a pending separation claim, and you're saying, well, sometimes insurers intervene in that suit or hire their own attorneys. Here we didn't know, as you said, in the uncontradicted affidavits from Mr. Campworth in the record, we didn't know about a claim against a tort feeser. They didn't tell us until right, whatever, October, November of that year, there was a notification that, yes, we have a tort lawsuit, we already have a settlement offer, and we want to make an uninsured motorist claim. So we said, when we knew, we didn't say, we told them we're waiving any subrogation claim. At that point, there was nothing to ask them to protect our interest against anybody. We had offers to, which they declined, in the case their client didn't want to pursue the tort feeser. We don't know whether their client does. There's still, the tort feeser is technically liable, if it's liable in tort, for the medical payments that we paid, or could be found liable. And so there was no reason to ask them not to do anything, because there was nothing there that we knew about that was pending for them to do something on, or charge us for. And then when we waived it, now we're not asking anybody on our behalf to pursue anybody. We're not claiming any of the $100,000 that they got from the tort feeser that we just learned about. We're waiving it, so we're not asking them to do anything. When we found out about the attempt, or the effort, or the success, in getting the $100,000, we said, at that point, we're waiving any subrogation claim. We didn't ask them to do anything. So it's the same thing as, I think, as telling somebody not to do anything on your behalf when you tell them that you're waiving any subrogation claim. Didn't you write them the first two letters prior to that? Yes, we had written letters previously from the subrogation department. They'd written asking if they would enter an agreement for a contingency to pursue it at that time. But that was prior to our knowledge of any claim being pursued against the tort feeser. At that point, there was just the matter of... Where else would they have gotten the money from? I mean, who else would they have pursued to get a common fund from? Well, we didn't know they were pursuing anybody at that point. Sometimes... You asked them to preserve your interest, right? Oh, right, because obviously... In what? They might not want you against the tort feeser for the $50,000 we paid, and... Right. And at what point are you saying, then, you didn't know that there was a claim against the tort feeser? I mean... We didn't know then, because, for example, what if they thought the case was only worth $50,000 for liability reasons or other reasons? And not every accident results in a lawsuit. Not every... Right, but I mean, whatever it was worth, you still had your lien, right? We had a lien for $50,000. And you asked them to protect it. We did ask them to protect it. If that was the only... For example, we could have hired our own attorneys to sue the tort feeser, or we could have asked... And you never would have had to write them the letters, because you would have had your own... If that was the only issue, if there was no underinsured motorist claim, at that point, we didn't know of an underinsured motorist claim because there wasn't any. So we could have... We had $50,000 out of pocket and a potential tort feeser, and that's all we knew at that point. And then we could have hired our own lawyer, or we could have hired them. They declined, because they never entered an agreement. I mean, they said they did it anyway, without a formal agreement. But... Doesn't Stevens require something more affirmative, though? You have to tell them not to act on your behalf. Well, I think telling them not to act on our behalf, where we're waiving any claim, and how can we not tell them to do anything? You have to say, we waive it, and we don't want you to do anything for us for the thing we've waived? Isn't that a nullity? Because you've already waived it. You don't have a right to anything. So how can you ask them not to do something that you already don't have anymore, if you've waived it? I think the examples of the different situations of like the 250, say you had, for example, we had the example of the 250 underinsured, uninsured motorist claim, where there's no torque fees, where we would just pay the 250. Of course, if we had medical payments, the contract language wouldn't come into play, because there's no... I'm sorry. If there was a torque fee, with $250,000 of liability coverage, and we pay $50,000 medical payment, this set-off language wouldn't come into play, because there's nothing, there's no uninsured motorist coverage to reduce. It doesn't exist, because the limits of the torque fees are matched. That's why it always depends on the... It sort of depends on the type of claim, too. If it's an uninsured motorist situation, and their damages are worth $250,000, and there's been $50,000 of med pay, there would be... Those would reduce the uninsured motorist limits by $50,000 by the language. If, again, liability case, 250 limits, there wouldn't be reduced, because there's nothing to reduce. Thank you. So the $100,000 recovery here, that by operation of the language, is uninsured motorist coverage, so it presumes there was a torque fee, if they don't collect the $100,000, there's no underinsured motorist claim, or there's at least a credit for the $100,000 by operation of contract. They didn't do any benefit for us. We're contracting to pay underinsured. We're contracting to pay over someone's limits. We're not agreeing to pay, so there's no benefit, because our contract is not to pay below the liability limits of the torque fee, if there is a torque fee. So there's no benefit in that situation. And here, again, under the facts of this case, leads to the $16,000 being paid over the limits, which, where there was no common fund, we've created for country mutuals benefit. And therefore, again, I would ask that the court vacate the judgment below. Thank you. Thank you. We will be in a short recess for a panel change, taking this matter under advisement and renewing the decision without undue delay.